## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION AT COVINGTON

| | | |
|---|---|---|
| **Al and Jo Anna Viviano** | : | **Case No. :** _____ |
| **7804 Albrecht Circle** | : | |
| **Louisville, KY 40241** | : | **Judge** _____ |
| | : | |
| **and** | : | |
| | : | |
| **Paul Turner** | : | |
| **1014 Thunderbird Drive** | : | |
| **Cincinnati 45231** | : | |
| | : | **CLASS ACTION COMPLAINT** |
| **and** | : | **FOR DAMAGES AND** |
| | : | **EQUITABLE RELIEF, AND** |
| **Kyle Briggs** | : | **JURY DEMAND** |
| **133 N.E. 2d Avenue, Apt. 3305** | : | |
| **Miami, Florida 33132** | : | |
| | : | |
| **and** | : | |
| | : | |
| **Shalini Ignatenkov** | : | |
| **7839 Callisto Drive** | : | |
| **Liberty Township, Ohio 45044** | : | |
| | : | |
| **and** | : | |
| | : | |
| **Charles and Karen Gibbens** | : | |
| **7266 Salem Ridge** | : | |
| **Aurora, Indiana 47001** | : | |
| | : | |
| **and** | : | |
| | : | |
| **Lori S. and Thomas A. Trahan** | : | |
| **2743 Felicity Place** | : | |
| **Cincinnati, Ohio 45211** | : | |
| | : | |
| **and** | : | |
| | : | |
| **Erica Thomas** | : | |
| **2702 East Tower Drive; Apt. 207** | : | |
| **Cincinnati, Ohio 45238** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |

vs.                                                 :
                                                    :
**TOYOTA MOTOR ENGINEERING &**                      :
**MANUFACTURING NORTH**                             :
**AMERICA, INC.**                                   :
<u>**Agent for Service of Process:**</u>            :
**CT Corporation System**                           :
**4169 Westport Road**                              :
**Louisville, Kentucky 40207**                      :
                                                    :
**and**                                             :
                                                    :
**TOYOTA MOTOR MANUFACTURING,**                     :
**KENTUCKY, INC.**                                  :
<u>**Agent for Service of Process:**</u>            :
**CT Corporation System**                           :
**4169 Westport Road**                              :
**Louisville, KY 40207**                            :
                                                    :
**and**                                             :
                                                    :
**TOYOTA MOTOR SALES, U.S.A., INC.**                :
<u>**Agent for Service of Process:**</u>            :
**CT Corporation System**                           :
**4169 Westport Road**                              :
**Louisville, KY 40207**                            :
                                                    :
                                                    :
**TOYOTA LEASE TRUST,**                             :
<u>**Agent for Service of Process**</u>**:**        :
**CT Corporation System**                           :
**4169 Westport Road**                              :
**Louisville, KY 40207**                            :
                                                    :
                                                    :
                          **Defendants.**           :

---

## INTRODUCTION

1.      After knowing of sudden acceleration problems for several years and after making

modifications to vehicles sold in Europe to allegedly correct the problem, Toyota recently

acknowledged that its American sold vehicles suffer sticking accelerator pedals and recalled them.

2

Unfortunately, this acknowledgement does not identify the true problems, it also came too late and at too great a price. Drivers and passengers of Toyota vehicles have died and suffered serious injuries and property damage. All owners and lessees of Toyota made vehicles have also suffered economic damage to their property.

2.     The Eastern District of Kentucky has played an important and intricate role in this unfortunate saga. Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is headquartered and its principal place of business is in Erlanger, Kentucky, within this District. Defendant TEMA is responsible for Toyota's engineering design, development, research and development, and manufacturing activities in the U.S., Canada and Mexico. Additionally, Defendant Toyota Motor Manufacturing, Kentucky, Inc. ("TMMK"), Toyota's largest manufacturing facility outside of Japan and the facility that manufactures the popular Toyota Camry, is located in Georgetown, Kentucky, within this District.

3.     Defendants Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA"), Toyota Motor Manufacturing, Kentucky, Inc. ("TMMK"), Toyota Motor Sales, U.S.A., Inc., and its affiliate have known since at least 2002 that its vehicles could accelerate uncontrollably, resulting in crashes causing serious injuries and deaths of occupants.  Through the fall of 2009, Toyota received more than 2,000 complaints of unintended acceleration of its vehicles and was the subject of multiple investigations by the federal government. However, in spite of the numerous complaints by customers and the government investigators, Toyota did nothing -- other than deny there was a problem.

4.     In August 2009, a California Highway Patrol Officer and his family were killed when their Toyota-made vehicle suddenly accelerated and their brakes failed to stop their car.  The vehicle crashed into an SUV, ran through a fence, rolled over and burst into flames.

3

5.     After this tragedy and others like it, Toyota continued to attempt to minimize the problem and conceal its extent. First, Toyota blamed the acceleration on floor mats.  Toyota informed customers that they could prevent any risk of danger by simply removing the floor mats on the driver's side.  As of November 2009, Toyota stated "there is no evidence to support" any other conclusion.  Toyota stated that the National Highway Traffic Safety Administration (NHTSA) supported the company's conclusion, but the agency responded by stating that Toyota's statement was "misleading and inaccurate."

6.     As a consequence of Defendants unlawful and misleading business practices, Plaintiff has also suffered economic harm, which includes the loss in value of the vehicle and being deprived of the full use, benefit, and value of her vehicle.

7.     Instead of being told the truth about the dangerous propensity of Toyota vehicles to suddenly accelerate, consumers like the Plaintiffs were given assurances that their vehicle was safe and defect free.  For example, they were given a Warranty and Maintenance Guide which states: "At Toyota, our top priority is always our customers.  We know your Toyota is an important part of your life and something you depend on every day.  That's why we're dedicated to building products of the highest quality and reliability. . . . Our goal is for every Toyota customer to enjoy outstanding quality, dependability and peace of mind . . .."

8.     After years of covering up the life-threatening problems in its vehicles, on January 21, 2010, Toyota announced that it was recalling 2.3 million vehicles for the alleged reason of "sticking accelerator pedals."   Toyota stated that its investigation, which it said it had only conducted "in recent months," "indicates there is a possibility that certain accelerator pedal mechanisms may, in rare instances, mechanically stick in a partially depressed position or return slowly to the idle position." (emphasis added)  The models recalled were: RAV4, Corolla, Matrix,

Avalon, Camry, Highlander, Tundra and Sequoia.  Thus, Toyota continued to downplay the problems by saying they were caused by floor mats and by accelerator pedals that were the wrong size. Toyota covered up the fact that when it replaced the traditional mechanical throttle linkage in the late 1990s with a computer-controlled accelerator system, unlike American automobile companies.  On information and belief, Toyota failed to include back-up safety systems that would prevent uncontrolled acceleration.  On information and belief, Toyota omitted the back-up safety systems in order to save money and increase profits.  As a result of the lack of safety systems, there is no adequate mechanical or electronic failsafe mechanism to allow drivers to stop Toyota vehicles in the event the acceleration systems malfunction and engage in uncontrolled acceleration.

9.      On January 26, 2010, Toyota stopped selling the eight recalled models, stating that preventing the sale of the vehicles was "necessary until a remedy is finalized."  Despite believing that the problem was serious enough that it was necessary to keep additional vehicles from being driven, Toyota did nothing to prevent vehicles already sold or leased from being operated, nor did it offer to cancel leases and purchases and refund the monies paid by its customers.

10.      Consumers have attempted to call Toyota's 800 number for help or information and get a recording "all agents are busy…try your call later."

11.      Consumers have attempted to schedule repairs but were told they could not get their vehicle fixed until they received a letter.  When they informed Toyota agents that they were afraid to drive the vehicle they received no assistance.  Upon information I believe, the repairs currently being performed will not adequately address the dangerous defect.

12.      Consumers have not received substitute vehicles and are simply left to drive admittedly dangerous vehicles.

## THE PARTIES

13.    Plaintiffs Al and Jo Anna Viviano own a 2006 Avalon. The Viviano live in Louisville, Kentucky. They purchased the Avalon from Oxmoor Toyota in Louisville.

14.    On January 16, 2010, the Viviano's Avalon accelerated into a line of traffic. At the time, Mr. Viviano was coming to a stop. Suddenly, the Avalon started to accelerate. Mr. Viviano pumped his brake but it did not help.

15.    Mr. Viviano escaped from a broadside collision on the driver's side by a car traveling about 45 miles per hour heading towards him. Fortunately, the driver slammed on the breaks and stopped just in time...preventing a very, very serious accident.

16.    Plaintiffs Al and Jo Anna Viviano are concerned for their safety and the safety of others. Additionally, they believe that Defendants' actions have caused them to sustain economic injuries specifically damage to their property.

17.    Plaintiff Paul Turner owns a 2007 Camry. Mr. Turner resides in Cincinnati. Ohio.

18.    Since he has owned the car, he has experienced, on a t least five occasions, the car suddenly accelerating.

19.    Plaintiff Turner is concerned for his safety and the safety of others. Additionally, he believes that Defendants' actions have caused him to sustain economic injuries specifically damage to his property.

20.    Plaintiff Kyle Briggs owns a 2007 Prius and resides in Miami Florida. Since he purchased the Prius, he noticed that Prius periodically accelerated without reason.

21.    On December 27, 2009, Plaintiff Briggs was involved in a collision.  He was traveling less than 35 mph behind a taxi cab, when his car suddenly accelerated. The unexpected acceleration caused him to hit the taxi cab.

6

22. The collision damaged his car. The cost to repair his Prius was $ 7,500.00. Additionally, the police cited him for "failure to decrease speed," and he paid a fine of $165.

23. The repairs to his car took 5 weeks to complete. During this period, Mr. Briggs paid the cost of a rental car.

24. Plaintiff Briggs believes that the taxi cab driver and his passengers are pursuing injury claims.

25. Plaintiff Briggs is concerned for his safety and the safety of others. Additionally, he believes that Defendants' actions have caused him to sustain economic injuries specifically damage to his property.

26. Plaintiff Shalini Ignatenkov resides in Liberty Township, Ohio and owned a 2002 Camry.

27. On April 17, 2009, Plaintiff Ignatenkov was at a Shell gas station in Warren County, Ohio. She was backing up to access a vacuum. Suddenly, her car began to accelerate and she lost control of her Camry. Her car struck an adjacent gas pump and a nearby car. The collision caused a fire that damaged both cars and the canopy over the gas pumps.

28. The owners of the Shell station have brought an action against Ms. Ignatenkov and seek at least $110,000 in damages.

29. Plaintiff Ignatenkov is concerned for her safety and the safety of others. Additionally, she believes that Defendants' actions have caused her to sustain personal injuries and economic injuries specifically damage to her property.

30. Plaintiffs Charles and Karen Gibbens reside in Aurora, Indiana and own a 2009 Toyota Corolla. They purchased the Toyota in Dry Ridge, Kentucky.

31.     On October 29, 2009, Charles Gibbens was driving the Corolla and Karen Gibbens was a passenger.   They were traveling on Interstate 275 in Kentucky. The Corolla unexpectedly "took off" and kept accelerating.

32.     At first, the Gibbens were in the far left lane of three lanes.  Mr. Gibbens tried to bring the car under control.  The Gibbens are certain that the floor mats were not stuck under the gas pedal.

33.     The Gibbens contacted Dry Ridge Toyota, where they purchased the car. The dealership disputed the incident. The Gibbens, however, refused to drive their Corolla and were forced to pay an additional $2,251.72 for a 2010 Corolla.

34.     Plaintiffs Charles and Karen Gibbens are concerned for their safety and the safety of others. Additionally, they believe that Defendants' actions have caused them to sustain economic injuries specifically damage to their property.

35.     Plaintiff Lori S. and Thomas A. Trahan reside in Cincinnati, Ohio and own a 2007 Toyota Rav4. They purchased the Rav4 in Florence, Kentucky.

36.     On December 4, 2008, Thomas Trahan was driving the Rav4 in Fort Worth Texas. The Rav4 began to accelerate. Mr. Trahan was unable to control the Rav4. The car crashed into the side of a hotel.

36.     The collision caused Mr. Trahan to suffer serious and life threatening injuries. After the collision, Mr. Trahan required a ten day hospital stay and was in the Intensive Care Unit for seven days.

38.     Plaintiffs Lori and Thomas Trahan are concerned for her safety and the safety of others. Additionally, they believe that Defendants' actions have caused them to sustain personal injuries and economic injuries specifically damage to their property.

8

39.     Plaintiff Erica Thomas resides in Cincinnati, Ohio. She owns a 2009 Toyota Camry.

40.     Plaintiff Thomas has noticed since February of 2009 that her Camry speeds up and jerks. She took the Camry to her local Toyota dealer, King's Toyota, of Mason Ohio. The dealer reset the computer. The attempted repair failed to correct the problem.

41.     Plaintiff Thomas has stopped her to stop driving the car and relying on others for her transportation needs.

42.     Plaintiff Thomas is concerned for her safety and the safety of others. Additionally, she believes that Defendants' actions have caused her to sustain economic injuries specifically damage to her property.

Plaintiff Holly Boyd resides in Oxford, Ohio and owns a 2009 Camry LE.

43.     On August 19, 2009, her Camry began to unexpectedly accelerate while she pulling into her parking space at the Talawanda school. As car the accelerated, it hit the car in front and continued until it struck and went through a metal fence.

44.     Plaintiff Boyd is concerned for her safety and the safety of others. Additionally, she believes that Defendants' actions have caused her to sustain economic injuries specifically damage to her property.

45.     Defendant Toyota Motor Engineering & Manufacturing North America, Inc. (TEMA) is headquartered and its principal place of business is in Erlanger, Kentucky, within this District.  Defendant TEMA is responsible for Toyota's engineering design, development, research and development, and manufacturing activities in the U.S., Canada and Mexico.  TEMA was created in April 2006 following the consolidation of Toyota Technical Center and Toyota Motor Manufacturing North America.  TEMA operates 14 parts and vehicle manufacturing plants across North America.

46.     Defendant Toyota Motor Manufacturing, Kentucky, Inc. (TMMK), Toyota's largest manufacturing facility outside of Japan, builds the Avalon and the Camry.  In addition, TMMK builds 4-cylinder and V6 engines and powertrain parts that upon information and belief, are subject to the unintended acceleration defect. Toyota Motor Manufacturing, Kentucky, Inc. is located at 1001 Cherry Blossom Way in Georgetown, KY 40324, within this District.

47.     Defendant Toyota Motor Sales, U.S.A., Inc. (TMS-USA) is, and at all material times was, a California Corporation headquartered in Los Angeles. TMS-USA is a wholly-owned subsidiary of Toyota Motor Corporation, and is responsible for the manufacture, distribution and sale of all Toyota and Lexus automobiles and trucks in the United States.

48.     Toyota Motor Credit Corporation (TMCC) is a wholly-owned subsidiary of TMS-USA and was incorporated in California in 1982. In October 1996, TMCC created Toyota Lease Trust (TLT), a Delaware business trust to act as lessor and to hold title to leased Toyota vehicles in specified states in connection with a lease securitization program.  TMCC acts as the servicer for lease contracts purchased by TLT from the Toyota and Lexus dealers and services such lease contracts in the same manner as contracts owned directly by TMCC.  TMCC holds an undivided trust interest in lease contracts owned by the TLT.

**JURISDICTION AND VENUE**

49.     This Court has Federal Question jurisdiction pursuant to 28 U.S.C. Section 1331 and 18 U.S.C. Section 1962 (c), Racketeer Influenced and Corrupt Organization Act. The Court, pursuant to 28 U.S.C. Section 1367, has supplemental jurisdiction over claims not arising under 18 U.S.C. Section 1962 (c).  Venue is proper in this District pursuant to 28 U.S.C. Section 1391,

because a substantial portion of the acts and omissions complained of occurred in this district and pursuant to 18 U.S.C. Section 1965 (a), Racketeer Influenced and Corrupt Organization Act.

## CLASS ACTION ALLEGATIONS

50.     Plaintiffs bring this action on behalf of a class consisting of:

All residents and citizens of the United States who purchased or leased Toyota manufactured vehicles that share common design and engineering defects that allow Toyota manufactured vehicles to experience sudden unintentional acceleration.

51.     Specifically excluded from the proposed Class are Defendants, any entities in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, successors, subsidiaries and/or assigns of Defendants.

52.     This action may properly be maintained as a class action under Federal Rule of Civil Rule 23 because the action satisfies the numerosity, typicality, adequacy, predominance and superiority requirements of the Rule.

53.     The Plaintiffs and all Class Members seek damages and other relief, including but not limited to, compensatory damages for personal injuries, reimbursement of costs, litigation expenses, interest to the extent legally applicable, punitive damages, attorneys' fees, injunctive relief, and any other relief to which they may be entitled in law and/or equity.

54.     The number of Class Members is so numerous that joinder of all members is impracticable.  The Class consists of millions of residents and citizens of the United States. The number of Class Members and the identity of the Class Members easily can be obtained through the records of the Defendants.

55.     The claims of Plaintiffs are typical of the claims of the Class that they seek to represent.  The Defendants have treated all of the Class Members the same, and all of the recalled vehicles possess similar defects.

56.     The Plaintiffs will protect fairly and adequately the interests of the members of the Class.  The Plaintiffs chosen counsel are experienced in class action litigation and will diligently and professionally prosecute the litigation.

57.     Common questions of law and fact exist as to the Plaintiffs and all members of the Class.  The common issues include but are not limited to:

A.      Whether the defendants should be declared financially responsible for notifying all class members of the defective nature of the cars and for the costs and expenses of inspecting, repairing, and replacing of all such vehicles;

B.      Whether the cars are defective;

C.      Whether design defects cause the vehicles to crash;

D.      Whether the defendants knew or became aware that the vehicles were not properly designed, yet continued to manufacture, distribute, advertise, and market the cars without correcting the problems and while concealing the defective design  from the public and the class;

E.      Whether the defendants engaged in a pattern and practice of deceiving and defrauding the class and suppressing the defective nature of the cars;

F.      Whether the defendants failed to give adequate warnings regarding the cars;

G.      Whether the defendants, through written advertising and other representations, created express or implied warranties that were breached;

H.      Whether the defendants are strictly liable for damages to the plaintiffs and the members of the Plaintiffs' Class;

I.      Whether the defendants acted negligently;

J.      Whether the plaintiffs and the members of the Plaintiffs' Class are entitled to compensatory damages, and, if so, the nature of such damages;

K.      Whether the plaintiffs and the members of the Plaintiffs' Class are entitled to punitive or exemplary damages and, if so, the nature of such damages; and

L.      Whether plaintiffs and members of the Plaintiffs' Class are entitled to an award of reasonable attorneys' fees, prejudgment interest, post-judgment interest and costs of suit.

M.      Whether Defendants violated 18 U.S.C. Section 1962 (c), Racketeer Influenced and Corrupt Organization Act.

58.     A class action is superior to all other available methods to adjudicate this litigation. Additionally, common issues predominate over individual issues. The size of the Class renders joinder impracticable.  The failure to certify the Class likely will prevent consumers who are driving on dangerous cars from pursuing their claims because of the expense of individual litigation. Individual litigation will be burdensome, time consuming, and repetitive.  The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and it provides access to the courts for thousands of Ohio residents who are driving dangerous cars.  Accordingly, class certification pursuant to Fed. R. Civ. P. 23 (b) (3) is desirable and appropriate.

59.     Class certification pursuant to Rule 23(b)(1)is appropriate because the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class.  Individual litigation could result in some courts requiring the Defendants to immediately replace all cars, stopping lease and car payments, and other courts permitting the Defendants to delay replacements and permit Defendants to continue to collect payments from members of the class.  Obviously, the Defendants could not comply with differing sets of inconsistent orders.

60.     Class Certification pursuant to Rule 23 (b) (2) is appropriate because the Plaintiffs and all members of the Class seek declaratory and injunctive relief. The Class seeks an Order that declares their right to the immediate replacement of cars and entitlement to stop making payments.

## COUNT I

**VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT. 18 U.S.C. SECTION 1962 (C)**

61.     Plaintiffs incorporate by reference and each and every allegation as if fully rewritten herein.

62.     Defendants are and were at all times mentioned herein "persons" as that term is defined in 18 U.S.C. § 1961(3).

63.     Toyota's car dealerships and related organizations constitute an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), which is engaged in and affects interstate and foreign commence.  Said enterprise at all times mentioned herein was and is engaged in the distribution and sale of Toyota vehicles to consumers throughout the United States.  The enterprise is an ongoing organization with a common purpose, a defined hierarchy, and a regularity of function.

64.     Defendants are associated with the enterprise, and knowingly and willfully conduct and participate in the conduct of the enterprise's affairs, directly and indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  Each of the Defendants derives income, directly and indirectly, through their operation, management or control of the enterprise.

65.     The pattern of racketeering activity engaged in by Defendants involves a scheme to sell defective and dangerous vehicles carried out for several years and continuing to this time.  The pattern of racketeering is separate and distinct from the legitimate sale of vehicles undertaken by the enterprise.

66.     Defendants specifically encouraged, through multiple mailings and phone calls, the enterprise and its members to sell vehicles that Defendants knew were unsafe and suffered from design and engineering defects. As discussed throughout this Complaint, Defendants were aware of reports of sudden and unintended acceleration and understood that their vehicles had safety and design issues. Yet, Defendants as part of their scheme sought to use the Enterprise and its members to sell the defective vehicles to Plaintiffs and members of the class. Defendants represented in multiple mailings and telephone calls to the Enterprise and its members and in communications with

Federal and State officials including but not limited to NHTSA that Toyota vehicles were safe. Defendants in their mailings and telephone calls omitted material information concerning the known dangers of driving Toyota vehicles that shared common design and engineering characteristics that cause the vehicles to suddenly accelerate. Defendants intended that the Enterprise and its members transmit this false and misleading information to Plaintiffs and members of the class.

67.     The Enterprise and its members did transmit this false and misleading information to Plaintiffs and members of the class. Plaintiffs and members of the class relied on the false and misleading information when they made their decisions to purchase or lease the Toyota vehicles that form the subject matter of this litigation.

68.     Evidence of Defendants scheme is reflected in a recent Congressional committee meeting.  On January 27, 2010, Toyota officials, during a Congressional hearing, said that they first learned of "sticking pedals" in England and Ireland in the spring of 2009. But Toyota acknowledged that it had received reports in England and Ireland as early as December 2008. Toyota in its numerous mailings and phone calls to its dealers assured the dealers that the cars were safe. Additionally, in November of 2009, NHTSA found that Toyota had issued "inaccurate and misleading" statements on the cause of sudden acceleration cases connected to floor mats. Toyota in mailings and phone calls made similar statements to its dealers. Toyota acknowledges that it had information but failed to share it with the public or with its dealers who were the consumers' last chance to learn that Toyota's vehicles possessed engineering and design defects that permitted sudden acceleration  According to the February 7, 2010 edition of the New York Times, Shinichi Sasaki, the Toyota executive in charge of quality, admitted that "We did realize that it was not good that pedals were not returning to their proper position, but we took some time to consider whether we needed to take market action."

15

69.     The pattern of racketeering activity engaged in by Defendants involves schemes and artifices to defraud constituting mail fraud (U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343), all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(B).  Defendants have engaged in these schemes and artifices with the specific intent to defraud, causing damage to the property interests of members of the class.

70.     The pattern of racketeering engaged in by Defendants involves thousands of predicate acts constituting mail fraud and wire fraud, as previously set forth above.  All of these acts are related to the pattern of racketeering and have taken place over many years, establishing both relatedness and continuity.

71.     As a proximate result of the pattern of racketeering engaged in by Defendants, members of the class suffered damage to its property, including decreased value to their vehicles purchased from members of the enterprise, repairs, increased insurance deductibles and insurance, and the cost of loaner or replacement vehicles.  Members of the class do not allege that this claim applies to any personal injuries that class members sustained because of Defendants' conduct.  However, the claim does apply to economic damage caused.

## COUNT II

### Fraudulent Concealment and Fraud by Omission

72.     Plaintiffs incorporate by reference and restate each and every allegation above as if fully rewritten herein.

73.     Toyota has known since at least 2002 and possibly as early as 2000, and likely much earlier, that its vehicles were subject to sudden and unintended acceleration that placed occupants of its vehicles at great risk of death. Toyota was aware that there were fatalities in its vehicles because of unintended acceleration from 2002-09. Toyota knew that the risk of losing control of a vehicle in

a high speed accident would be very frightening and dangerous to consumers and would cause Toyota's sales to decline. Toyota intentionally concealed the information, or acted with reckless disregard for the truth, and denied the consuming public information that is highly relevant to their purchasing decision. Toyota fraudulently concealed the information for years, because it was more important to Toyota to increase sales and become the largest manufacturer in the world. Toyota sacrificed innocent, trusting lives for profit and hubris.

74.     Toyota's customers relied on Toyota's reputation coupled with the fact that Toyota did not disclose the acceleration problems, in purchasing or leasing Toyota's vehicles. The facts concealed were material, because if they had been disclosed Class members would not have bought or leased the vehicles. The concealment was all the more effective because it came from one that had represented itself to be honorable and trustworthy.

75.     As a result of their reliance, Plaintiffs and other Class members have been injured in an amount to be proved at trial, including, but not limited to the loss of value of the use of the vehicles they leased or bought, the fear and other emotional trauma as a result of being forced to drive vehicles that Toyota has admitted are unsafe due to Toyota's refusal to provide replacement vehicles, and injuries and deaths resulting from accidents caused by sudden acceleration.

76.     Defendants' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and other Class members.  Plaintiffs and other Class members are therefore entitled to an award of punitive damages.

## COUNT III

### Fraud

77.     Plaintiffs incorporate by reference and restate each and every allegation above as if fully rewritten herein.

78.     Defendants represented to Plaintiffs and Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the vehicles they were selling were new, had no significant defects and would perform and operate properly when driven in normal usage. In fact, Toyota affirmatively represents that its vehicles are "reliable."

79.     The vehicles purchased or leased by Plaintiffs and Class Members were, in fact, defective, unsafe and unreliable, because the vehicles were subject to sudden, extreme acceleration leading to personal injury or death.

80.     The aforesaid representations of Defendants were material, because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle.  Toyota knew the representations were false, because it knew that people had died in its vehicles unintended acceleration between 2002 and 2009. Plaintiffs and Class members relied on the statements and others like them in purchasing their vehicles.  Toyota intentionally made the false statements in order to sell vehicles.

81.     As a result of Toyota's conduct, Plaintiffs and Class members have been defrauded into leasing or purchasing vehicles that had undisclosed defects. Plaintiffs and Class members have been damaged in an amount to be proven at trial.

82.     Defendants' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in conscious disregard for the rights of Plaintiffs and other Class

18

members.   Plaintiffs and other Class members are therefore entitled to an award of punitive damages.

## COUNT IV

### Violation of Consumer Protection Act, K.R.S. 367.110 et seq.

83.    Plaintiffs incorporate by reference and restate each and every allegation above as if fully rewritten herein.

84.    The Consumer Protection Act, K.R.S. Section 367.170, prohibits unfair or deceptive consumer sales practices. Specifically, the Act prohibits "unfair, false, misleading, or deceptive acts or practices in the conduce of any trade or commerce." id.

85.    The conduct of Defendants alleged above constitutes unfair and/or deceptive consumer sales practices in violation of K.R.S. Section 367.170, because Defendants represented through advertising and other marketing communications that the vehicles were new and free from defects and could be driven safely in normal operation. Instead, the vehicles were not of the standard, quality or grade of new vehicles.

86.    Defendants' conduct caused Plaintiffs damages as alleged.

87.    Plaintiffs specifically do not allege herein a claim for violation of K.R.S. Section 367.840-42.

88.    As a result of the foregoing wrongful conduct of Defendants, Plaintiffs and the Class have been damaged in an amount to be proved at trial.

## COUNT V

## False Advertising and Negligence Per Se

89.     Plaintiffs incorporate by reference and restate each and every allegation above as if fully rewritten herein.

90.     Defendants violated K.R.S. Section 517.030, false or misleading advertising in connection with the promotion of goods.

91.      Toyota violated this statute because it advertised that its vehicles were safe and reliable contrary to the advertisements and similar representations by Toyota dealers, Toyota knew since 2002 that the recalled vehicles were highly dangerous, unsafe and unreliable due to the likelihood of the vehicles to rapidly accelerate.

92.     Toyota's violation of K.R.S. Section 517.030 is a misdemeanor.  K.R.S. Section 517.030(2).  Toyota is therefore negligent per se.

93.     As a result of Toyota's wrongful conduct, Plaintiffs and class members have been damaged in an amount to be proved at trial.

## COUNT VI

## Breach of Lease/ Contract

94.     Plaintiffs incorporate by reference and restate each and every allegation above as if fully rewritten herein.

95.     Plaintiffs and other members of the class entered into a lease agreement with Defendant Trust which inured to the benefit of all Defendants. Other members of the Class entered into agreements to purchase Toyota vehicles which also directly or indirectly benefited Defendants.

96.     The leases and purchase agreements provided that Class members would make payments and in return would receive a new vehicle that would operate properly.

97.     Defendants breached their agreements with Plaintiffs and other Class members, because the vehicles sold or leased to the Class members were defective and not of a quality that reasonably would be expected of a new automobile.

98.     Plaintiffs and other Class members have fully performed their duties under the purchase and lease agreements.

99.     Defendants are liable for all damages suffered by Class members caused by such breaches of contract.

**COUNT VII**

**Breach of Express Warranties**

100.    Plaintiffs incorporate by reference and restate each and every allegation above as if fully rewritten herein.

101.    Defendants made express warranties that new vehicles they sold would be fully operational, safe and highly reliable. The warranties were made in advertisements and statements by dealership salespeople. These affirmations of fact, including via commercial advertisements, are express warranties under the Uniform Commercial Code Section K.R.S. Section 355.2-313.

102.    Defendants breached these warranties because the vehicles sold to Plaintiffs and other Class members have been demonstrated to be unsafe, and, indeed, Toyota has now admitted the vehicles are unsafe by first recalling them and then ceasing their sale altogether. Toyota and Beechmont further breached the warranties by failing to provide safe automobiles after the problems were acknowledged and, instead are forcing customers to drive what were publicly identified as unsafe vehicles.

103.    Plaintiffs and other Class members have been harmed as a result of the breaches of warranty. First, Plaintiffs and other Class members have received vehicles that were worth far less than what they paid to lease or to purchase the vehicles. Second, the Class has been subjected to the very real fear of a horrendous accident if their vehicle were to reach uncontrollable speeds -- and this is because Defendants have failed and refused to provide substitute vehicles while the defective ones are repaired.

104.    Plaintiffs specifically exclude in this Complaint any claim for violation of K.R.S. Section 367.840-42, and this cause of action is not based on that section.

105.    Plaintiffs pray that all damages caused by these breaches be awarded

## COUNT VIII

## Unjust Enrichment

106.    Plaintiffs incorporate by reference and restate each and every allegation above as if fully rewritten herein.

107.    As a result of the foregoing wrongful, unjust and inequitable conduct, Defendants have obtained funds and property to which they are not entitled, and have been unjustly enriched at the expense of Plaintiffs and Class members.   Defendants should be required to make restitution of all amounts by which they were enriched through their misconduct.

## COUNT IX

## Breach of Implied Warranty of Merchantability

108.    Plaintiffs incorporate by reference and restate each and every allegation above as if fully rewritten herein.

109.    Defendants impliedly warranted under K.R.S. Section 355.2-314 that their vehicles are fit for the ordinary purpose for which such a product is sold.

110.    The ordinary purpose for which Defendants' vehicles are sold is to provide the purchaser with a vehicle that is capable of transporting the driver and passengers in reasonable safety during normal operation, and without itself unduly endangering them or members of the public.

111.    Defendants breached their implied warranty of merchantability by selling vehicles that have the propensity to suddenly and unintentionally accelerate, and which do not contain safety systems which would prevent such acceleration or allow a driver to safely slow and stop the vehicle when such acceleration occurred.

112.    Plaintiffs and Class members have been damaged in an amount to be proved at trial.

## COUNT X

### Breach of Implied Warranty of Fitness for a Particular Purpose

113.    Plaintiffs incorporate by reference and restate each and every allegation above as if fully rewritten herein.

114.    Defendants are, and at all relevant times have been, in the business of designing, manufacturing, distributing and selling motor vehicles to consumers.

115.    Defendants knew, when it leased and sold its vehicles to Plaintiffs and other Class members that such vehicles would be used by Plaintiffs and Class members for safely transporting occupants.

116.    Defendants also knew that consumers who purchased its vehicles relied on Toyota's skill and expertise, judgment and knowledge in furnishing vehicles, including components thereof, that were able to transport occupants without unreasonable risk of harm to themselves or members of the public.  Therefore, Toyota impliedly warranted under K.R.S. Section 355.2-315 that the vehicles were fit for the purposes Plaintiffs and class member intended for them.

117.    Toyota's vehicles were not fit for that purpose in that their design, choice of components or manufacture are so defective as to cause such vehicles to suddenly and unintentionally accelerate.  Additionally, the vehicles fail to provide an adequate means of braking or stopping vehicles that have so accelerated.

118.    As a result, Plaintiffs and Class members have been damaged in an amount to be proved at trial.

## COUNT XI

### Negligence

119.    Plaintiffs incorporate by reference and restate each and every allegation above as if fully rewritten herein.

120.    Toyota had a duty to its customers as a manufacturer of motor vehicles to provide vehicles that, in their ordinary operation, would be safe. Toyota had a duty to adequately test its vehicles' safety before selling millions to American consumers. Toyota particularly had a duty to test vehicles for acceleration system problems once Toyota was on notice that its vehicles had a propensity to suddenly accelerate and were causing bodily injury, death, and property damage.

121.    Toyota breached its duty to Plaintiffs and Class members.

122.    As direct and proximate causes of the breach, Plaintiffs and Class members have been damaged including, but not limited to, the financial loss of owning or leasing vehicles that are unsafe as well as being subject to the potential risk of injury.

## COUNT XII

## Strict Product Liability

123.    Plaintiffs incorporate by reference and restate each and every allegation above as if fully rewritten herein.

124.    Toyota is a manufacturer and supplier of automobiles.

125.    The automobiles that were leased or purchased by Plaintiffs and that were supplied by Toyota failed to comply with Toyota's representations, as alleged above, that the vehicles were safe, reliable and that they would accelerate and decelerate as users would reasonably expect.

126.    The automobiles supplied by Toyota were defective because, as alleged above, they are subject to rapid acceleration without notice and without the ability to slow or stop the vehicle.

127.    The vehicles were defective in design and manufacture because when they left the hands of Toyota they were more dangerous than an ordinary consumer would expect.

128.    The vehicles supplied by Toyota were defective due to inadequate warning or instruction and because Toyota knew that the product was defective and created a risk of harm to consumers and failed to warn of said risk.

129.    The vehicles supplied by Toyota were defective due to inadequate post-marketing warning or instruction because after Toyota knew of the risk of rapid acceleration.

130.    As a proximate result of the defective condition of Toyota's vehicles, Plaintiffs and Class members have been damaged in an amount to be proved at trial.

## PUNITIVE CONDUCT

131.    Defendants have fraudulently and knowingly concealed for years that their automobiles had defective acceleration systems that were causing death, bodily injury and property damage in the United States.  Defendants knowingly concealed this information in order to be able to continue to sell their defective, unsafe vehicles.  Moreover, Defendants defrauded American consumers by representing that their vehicles were safe and reliable when they were secretly aware of the highly dangerous acceleration system.  Defendants intentionally have violated consumer laws by falsely advertising that their cars were safe and reliable when, in fact, they are defective.

132.    Defendants conduct was knowing, intentional, with malice, demonstrated a complete lack of care and was in reckless disregard for the rights of the class members. Defendants' conduct has been outrageous and outside the bounds of decency.  Defendants should be punished due their conduct of putting others at risk of serious injury and death in order to make more profit.  Plaintiffs hereby request an award of punitive damages to appropriately punish Defendants for their extreme misconduct.

WHEREFORE, Plaintiffs pray for relief as follows:

## INJUNCTIVE RELIEF

133.    Plaintiffs Pray for an Order:

A.    Requiring Defendants to provide, or reimburse Plaintiffs and all members of the class for the cost of obtaining non-defective, replacement vehicles until the vehicles owned or

leased by Class members have been repaired or have been  replaced with vehicles that do not have defects in the accelerator or any other system;

B.      Requiring Defendants to provide any replacement parts first to dealerships for repair of cars already sold or leased, and only use such parts for manufacturing of new vehicles when all defective vehicles have been repaired;

C.      Requiring Defendants to provide counseling services to all Class members who have suffered emotional distress as a result of being forced to drive defective, dangerous vehicles after Defendants' numerous announcements of defects but failure to provide replacement vehicles;

D.      Requiring Defendants to reform their lease and finance contracts with class members and cease collecting lease payments or car payments from all Class members who leased or purchased Toyota vehicles with defects alleged n this Complaint.

## COMPENSATORY DAMAGES

134.    Plaintiffs on behalf of themselves and the Class seek an award of compensatory damages that will fairly represent the injuries, personal and economic, that Plaintiffs and members of the class suffered as proven at trial.

## PUNITIVE DAMAGES

135.    Plaintiffs on behalf of themselves and the Class seek an award of punitive damages that will fairly punish Defendants and serve as a deterrent to future misconduct that endangers the lives and safety of American motorists and pedestrians.  Defendants by withholding knowledge of dangerous conditions knowingly caused physical injuries to American consumers residents and caused them economic loss.

## ADDITIONAL RELIEF

136.     Plaintiffs on behalf of themselves and the Class seek an award that causes the disgorgement of all amounts by which Defendants have been unjustly enriched;

137.     Plaintiffs on behalf of themselves and the Class seek or an award of attorneys' fees and prejudgment interest; and

138.     Plaintiffs on behalf of themselves and the Class seek for such other and further relief as the Court and/or Jury may deem appropriate.

## JURY DEMAND

Plaintiff s hereby request trial by jury on all claims so triable.

Respectfully submitted,

*s/ Robert A. Steinberg*
Stanley M. Chesley (11810)
*Lead Counsel and Trial Attorney*
Robert A. Steinberg (91300)
WAITE, SCHNEIDER, BAYLESS,
  & CHESLEY CO., L.P.A.
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, OH 45202
Phone:          (513) 621-0267
Facsimile:      (513) 621-0262
Email:          wsbclaw@aol.com

## JURY DEMAND

Plaintiff s hereby request trial by jury on all claims so triable.

*s/ Robert A. Steinberg*
Robert A. Steinberg (91300)